1-3-2, Husteel v. United States. Mr. Park, please proceed. Thank you, Your Honors. May it please support, my name is David Park from Arnold and Porter on behalf of Plaintiff Appellant, Nexteel Co., Ltd. I'm here this morning to address four issues on affirmative. First, Commerce's calculation of Nexteel's constructed value profit using a third country profit rate for a company that had no ties, production or sales to the home market was unsupported by substantial evidence and contrary to law. Second, Commerce violated the plain language of the statute in failing to apply a constructed value profit cap. Third, Commerce's determination that it could not use zero or negative profits in its CV profit calculations were contrary to law. And fourth, Commerce's determination that Nexteel was affiliated with POSCO was unsupported by substantial evidence and contrary to law. With respect to the first issue in terms of the calculation of CV profit, the purpose of the anti-dumping statute is to measure the degree to which a respondent sells merchandise in the United States at less than normal value of the merchandise sold in the home market. It's essentially a price discrimination statute where you look at the conduct of the respondent in question and you compare prices between the two markets. Prior to this case, even when relying on constructed value, Commerce had consistently relied on a profit value that was based or tied to the home market. In this case, however, Commerce had departed from that practice contrary to the statute. Instead, Commerce relied on the financial statements first in the underlying investigation. I'm sorry, but I think the home market limitation is only present in the statute with regard to the profit cap. I don't see the home market limitation present in the statute with regard to the CV profit calculation. It's embedded into the three statutory provisions, Your Honor, if I may. In terms of looking at the three options for determining the appropriate profit cap, 1677BE2A presents three options. Roman 1, it says the actual amounts incurred and realized by specific exporter or producer being examined in the investigation or review for selling general and administrative expenses and for profits in connection with the production and sale for consumption in the foreign country of merchandise that is the same general category of products as the subject merchandise. The first option limits it to the foreign country, which Commerce has specifically interpreted and stated in the regulations, means the market in which constitutes the comparison market in which case would be Korea. Is it your suggestion that these provisions, including I and II and III, that they are in order? They're not in order, right? That is correct. That's just one of the three options that Commerce had to choose from. It's not that they're required to turn to same general category goods of the foreign country, right? That's correct, Your Honor. All three options are given without a specific hierarchy, but all three have a limitation to the foreign country. Option 1 is the actual exporter or producer in question, and there it is the same general category of merchandise in the foreign country. Option 2 is other producers in the foreign country of the foreign-like products, so it's limiting it to the foreign-like product, which is essentially the subject merchandise, but also again in the foreign country. Then option 3 is any other reasonable method, so that doesn't limit it to the home market at the outset. However, it provides a cap. The cap says that the amount allowed for profit may not exceed the amount normally realized by exporters or producers, again, for consumption in the foreign country of merchandise that's in the same general category. The way that it is set up is they're all tied back to the foreign country, the home market. The differences are which parties they're referring to and whether it's limited to the foreign-like product, which would be just the merchandise in question, or a broadening, which would be the same general category, which is broader than the foreign-like product. Those are the options that they have to choose from, Your Honor. In this particular instance, Commerce chose option 3, but it chose to also ignore the profit cap. In doing so, it claimed that because there was no same general category of merchandise in the original interpretation, it didn't even make an attempt to cap the profits tied to, again, the home country in this particular instance. On remand, it simply stated its calculated profit rate as a profit cap, essentially not capping it at all, just saying that those two were the same. Where we think Commerce erred, Your Honor, is that the statute specifically does give Commerce an ability to broaden the scope of the products it's examining. In other words, we talked about options 1 and 3 referring to the same general category of merchandise, which is broader. If they chose option 2, they had to stick with the foreign-like product. But it's in broadening the category of products that they're examining that they can still find sources within the home country, which is the preference here. All three options go to that. But what Commerce did instead, it kept referring to the primacy of the foreign-like product and saying, because there is no other products within the same general category, we're going to go and use the profit of Tenaris in the original investigation, a company that has global operations many times larger than the respondent in question, but with no production or sales in the home market. On remand, they included a Russian company. But again, this is a price discrimination statute, Your Honor. And by including the profits of wholly unrelated companies from their sales and production in wholly unrelated markets, you're essentially ignoring the statute, but also creating a price comparison that is wholly unrelated to the respondent in question. I guess I still don't understand your statutory interpretation argument, and I don't see what's wrong with the government's position that the home market limitation only applies to the profit cap and not to any other reasonable method. But even putting that aside, your alternative argument, it seems to me, which is they shouldn't have looked at Russia and Argentina, which are selling basically the same products. They should have looked at slightly different products in Corita. We review that under what standard of review, Mr. Park? It's the same standard of review that the CIT looked at, Your Honor, which is the substantial evidence and contrary law, Your Honor. And you think I should decide that non-OCTG products was a closer analogy than the exact same products in Russia and Argentina, and you want me to flip-flop that on a standard of review of substantial evidence? Yes, Your Honor. I knew that was your answer. I was hoping that you were understanding the inflection in my point. Yes, Your Honor. If I may address that point very specifically, first, again, we do believe, and our position is, that when you look at the three options, all three options require the home market, not just for the profit cap, Your Honor, but even for options one and two, which don't include the profit cap language. It is about profits in the foreign country, and the foreign country, Your Honor, is very specifically the home market. Nothing about the any other reasonable method is limited to the home market. Yes, Your Honor, but it must be capped. So, again, the first two options, again, Roman 1 and little i and 2i already have the foreign country requirement in there, but let me just go through again. I'll read in full the third option. Yeah, I've got it in front of me. Yes, but it's a second part of that. So, it says any other reasonable method, and it's except that provision. It's except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers, other than the exporter producer described in clause one, in connection with the sale for consumption in the foreign country. In other words, yes, you can use any other reasonable method, Your Honor, but it still must be capped by the home market experience. That has been commerce's interpretation throughout, even prior to this case, Your Honor. You want to save some of your rebuttal time? You've got only one minute left of rebuttal time. Yes, Your Honor, I will save the remaining time for rebuttal. Mr. Hoson, am I saying, Ms. Hoson? I don't know who's next. Am I saying your name right? DeFrancisco? I have going first, Hardeeb Kaur Hoson. I'm not sure if I'm saying this name right. Yeah. Josanne, Your Honor, actually, we're going to be responding to both the appellants. We're cross-appellant. They cross-appellant, so I think if we can go last. That's fine. It's just listed on my sheet wrong. Maybe at check-in, you all didn't explain that, but come on up then, Mr. DeFrancisco. Your Honor, Robert DeFrancisco from Wiley Rhyne on behalf of cross-appellants Mavericks and U.S. Steel. Your Honor, we believe the lower court made two critical errors in its initial decision. First, it concluded that the department's acceptance of the Tanaris financial statement was prejudicial, and two, that it required the department to use a fact-available profit cap. As a result of these two errors, we believe... And what's the standard of review that I need to review this one under? Certainly, Your Honor. With respect to whether it was prejudicial, with respect to accepting or not accepting the Tanaris profit cap, this court in PSC Avisma said that absent constitutional considerations, a court will defer to the judgment of the agency regarding the development of the agency record. This court went on in that case to discuss that this level of deference was necessary because the pursuit of what the court perceives to be the best or correct result would render judicial review totally unpredictable. So this is a much higher standard of review, a level of deference provided. You're telling me it's much higher is lovely, but standards of review have names. They have names called abuse of discretion, substantial evidence, clear error, and de novo. Which one is this? We believe this is an abuse of discretion here, and it's also contrary to the department, its own regulations. And the CIT in this situation essentially spells that out. In footnote 20 of the lower court's initial decision, the court says, this is a make or break issue and commerce should do its utmost to be fair in such circumstances. We believe this wasn't prejudicial. Under the department's factual information regulations, the respondents did have an opportunity to submit rebuttal information in the seven-day period that was allotted. And if they felt that that wasn't enough time, they could have asked for an extension, but they didn't do that. And the lower court going behind commerce and reinterpreting its factual information regulations was an error. The lower court analogized the situation to the department's factual information regulations with respect to non-market economies, which is not the case here. So the lower court concluded that the financial information that was submitted at the late stage in the proceeding was not to rebut, clarify, or correct questionnaire responses. It was further data. Correct? That's what the lower court concluded, the CIT. Your Honor, the lower court took issue with whether it was, in fact, to rebut and only addressed whether it was, in fact, to rebut. The lower court didn't address whether it clarified or corrected, one. The lower court found that that evidence was not submitted consistent with 19 CFR section 3.51.301C1V. Correct? Correct, Your Honor. And that section says that you can submit evidence to rebut, clarify, or correct. Correct? Correct. Okay. So the lower court found it was not consistent with the regulation that says you can only submit such evidence to rebut, clarify, or correct. It also found that by accepting it, it was prejudicial. But Your Honor, it does rebut and it does clarify. It is new data that you had an opportunity to present earlier, chose not to, decided to present it later. And it's hard for me, you know, you're really at an extreme disadvantage because the government hasn't come up here defending its first version of this either, have they? No, not at all. Nowhere in their brief do they defend the first decision that you're trying to defend. Instead, they're up here defending the second position. You're correct in that. Doesn't that sort of make you just a little nervous? Well, Your Honor, in their remand decision, they did indicate that they were conducting a portion of it under protest, that they didn't agree with the government's interpretation. Yeah, but they're not up here appealing it. They're not up here. They could have appealed and said the first remand was improper, right? Yes, Your Honor. And they chose not to. Okay. And when they went back, it's not that they threw this evidence out, right? They didn't say, okay, well, that evidence wasn't to rebut, clarify, correct, therefore we can't consider it. That's not what happened, is it? They reopened the record and accepted new information. And so they considered the very evidence that you wanted them to consider in the first instance, along with some additional evidence at that point, correct? Correct, Your Honor.  Correct, Your Honor. But the initial remand on that basis, we believe was incorrect. There was no need to reopen the record. The information was properly on the record. And in fact, just to go back to your earlier question, Your Honor. I don't see what was wrong with what the CIT did. It doesn't seem to me that that new evidence was to rebut, clarify, or correct. I see no problem with what he said. Tenaris information that was on the record was put on the record actually before the prelim. The department considered it. A portion of it, a portion of the Tenaris financial statement was on the record. In its preliminary decision said it's still going to continue considering the profit information and the profit issue. Issued a supplemental questionnaire in which it solicited more information with respect to profits and sales in Korea. And at that point, Maverick and U.S. Steel put on a whole host of information that happened to also include that Tenaris financial statement, which went to addressing the degree to which sales in Korea of product that was not OCTG are reflective of profit rates for OCTG producers, what one would expect to earn a profit on sales of OCTG relative to other pipes, what was going on in Korea. And that Tenaris financial statement goes to all of those issues. It identifies what one would expect as a major producer of OCTG, the types of profits you to expect to earn and what it should look like relative to these other types of products that they're selling. The other issue, Your Honor, as I mentioned earlier, is with regard to whether the department is required to apply a profit cap in this scenario in the any other reasonable method. In a situation where we have here that there are no sales of the same general category of nor the SAA require commerce to apply a profit cap. And we don't believe applying a profit cap or forcing commerce to apply a profit cap in a fact available scenario is appropriate here and that their original decision was correct in that regard. In fact, the lower court in an earlier case called Guipang Court recognized that the SAA approves commerce is no profit cap methodology for cases where no data is available at all, which is the situation we have here. There are no sales of the same general category of merchandise in Korea and therefore it's not appropriate to apply a profit cap in that scenario. With that, I'd like to reserve the balance of my time for rebuttal unless the court has any other questions. Okay. Ms. Josin, did I get it right that time? Yes. Very good. And you represent the government, right? Yes, that's correct. Just making sure I understand who everybody is. Go ahead. May I please report? Did I state all of the facts correctly? You heard my questions, meaning the facts related to the government's position on appeal. The government's position on appeal, as I understand it, is in defense of the second decision, which was affirmed by CIT and which is in front of us, but the government is not here today appealing and arguing that the first remand was improper. That's correct, Your Honor. Okay. And with regard to the issues that were before the trial court that we are defending and that should be affirmed by this court, the three issues are the CV profit, the affiliation, and Congress's decision not to apply adverse facts available. With respect to CV profit, I note that the statute- When you talk about adverse facts, the whole reason we're in an adverse facts arena at all, right, is because the forum producer didn't give the data that was necessary to make the calculations? That's correct, but Congress did not apply adverse facts here, and that was Mavericks. I understand, but that was the alternative that could have been possibly realized by Congress. That's correct. But Congress didn't do that. They went a different route, which resulted in probably, I would assume, I mean, because I've seen some of your adverse facts cases, and sometimes that number can be crazy high in terms of percentages, so I assume the numbers here were quite a bit lower than what adverse facts would have resulted in. Well, they would only have been, I mean, they were asking for a partial adverse facts available call, so just with respect to the certain calculation issues for HISCO and Nexteal, and Congress found that they had the available information to make the calculations, and the parties cooperated to the best of their ability in submitting the information, so that- It wasn't an issue. It wasn't an issue. With respect to CV profit, here, under statutory preference alternative three, it is not tied to the home market. Any other reasonable method is not tied to the home market. The earlier preferences that are- You agree that the profit cap is tied to a home market? That's correct. The profit cap- Okay, but not the any reasonable method. But not the any other reasonable method. The profit cap sure is. And here, Congress was faced with the choice between having data, profit data that represented the market in consideration, or data that represented the product under consideration. And in approximating Nexteal's profit, Congress reasonably determined that it was more akin to use the product at issue, OCTG. Given the premium nature of the product here, it makes sense. It makes economical sense. It's supported by the statute, and it's reasonable to say, you know what? We have these premium products here that are high-end. We should be comparing other premium OCTG products in order to approximate the profit that Nexteal would have gained. So there's two different questions. Now, I'd like to go back to the statute one, though, because you seem to have moved into the use of Russian and Argentinian data on like products, as opposed to non-OGCT product data from Korea. But I'd like to, if you don't mind, stick with the statute for a second. Sure. The question Judge Stoll asked about profit cap, you agree that if you're doing a profit cap analysis, you have to take into account consumption in the foreign country, correct? So that means within Korea, in this case. Both foreign country and of the same general category. So again, it has to be tied to both the product and the home market. But the three little I says, the amounts incurred and realized for selling general administrative expenses and for profits based on any reasonable method, except that the amount allowed for profit may not exceed. And so that's where the profit cap section begins, right? That's correct. You accept that? Correct. How come they accept that doesn't modify the any other reasonable method? I mean, any method, any reasonable method you're going to use is going to have to involve profits, because that's actually what you're trying to determine. You're trying to determine profits in order to assess dumping. And so why doesn't that except that the amount, which then goes into amount for profit may not exceed and ties it to foreign country consumption. I don't know. Why doesn't that get imported into the any other reasonable method? Because no matter what reasonable method you're going to choose, it's going to involve a profit analysis. I think the SAA actually is very instructive here. The SAA has, and I'm quoting, it says, it gives commerce when commerce cannot determine amounts, and I'm quoting for profit under a profit cap under alternative three, it might have to apply alternative three on the basis of the facts available. Then it goes further to state, this ensures that commerce can use alternative three when it cannot calculate the profit normally realized by other companies on sales of the same general category of products. So even the SAA is recognizing that, you know what, you might be in a situation where due to the absences of data on the record, commerce will not be able to have data that approximates both the same general category of the product and experience in the home market. So that thing is very instructive, and that's exactly what commerce had here. They had an absence of data. Parties had opportunities to submit data that would best reflect Nexteel's profit, and here commerce reasonably chose under any other reasonable method that it was more important to choose data that represented the premium nature of the product at issue rather than lower end pipe products that do not reflect the same profit, do not reflect the same gain. So had Nexteel had a viable home market of OCTG in Korea, other producers, Tenaris and TMK, their global sales of OCTG would better reflect that profit. As a statutory interpretation matter, is it the government's position that the is any other reasonable method except the amount for profit? So is it that 3i is modified by SAA in circumstances where data is not available on the cap? I'm trying to understand as a matter of statutory interpretation, SAA, can you tell me what it is? It's like something past when we had Uruguay, Brown. What is it? It's congressional intent. It's basically legislative history. Is it a statute? No, it's legislative history. It's a statement of administrative action. So it's basically congressional intent in enacting the statute. I don't understand that. What does that mean? What is it? Is it like a Senate hearing thing? What is this SAA? It's basically Congress when they passed the statute. Not the statute with 3i. It was later. This SAA came out later in time. No, no. It's with the Uruguay agreement. Okay. So when 3i came out, the statement was simultaneous. Yes. So they're explaining what, you know, and it's other, any other reasonable method. When you read that statutorily, there's no qualification versus. Okay. But let me ask about the SAA because I'm still a little confused. Like I know what a Senate report is, or I know what hearing statements are. So I'm just trying to understand, you know, you've referred to it as legislative history. I'm not such a big fan, but I want to understand where it falls in the hierarchy of, because there, I would hope you would admit there's a hierarchy of legislative history, right? Like some legislative history, like a Senate report, even for those who like the idea of legislative history would be viewed as a stronger piece of legislative history than a random statement of a single Senator in a hearing. You understand? This isn't a House report, right? Do I understand that correctly? Yes. It's, and it's, to explain the hierarchy, I think it's, when you, it's, especially with these trade agreements acts and with this statute, courts, this court and this trial court have numerous times found the SAA to be instructive on understanding the statutory provisions here. So this is a statement by congressional intent that explains and further instructs on the statutory provisions. A statement by who? You say Congress, but Congress has two houses. You know, is this found in a Senate report? Is it found in a House report as Judge Stolz suggested? Where is this? It's, I, it's, yeah, it's in the House report. It's part of the House report. Does that mean the Senate did not endorse this statement then? Because a House report and a Senate report are two different documents. So when you say Congress, you may be being imprecise, right? And these are statements outside of the statute. The statute is passed by both houses of Congress, signed by the president. Things in the House report are only articulated by the House, right? Am I understanding legislative history correctly? Yes, Your Honor. You are. So this SAA is in a, it's basically a House report statement regarding the intent, at least as the House believed. That's my understanding, Your Honor. Yeah. Yeah. Very satisfying for me. Let's, I mean, again, even, even irrespective of the SAA, that just, the statute, we believe is clear in saying that any other reasonable method, there's a comma there, yes, the profit cap, and courts have affirmed that interpretation where the profit cap is tied to the home market. Now you're speaking my language. And to the same category versus that any other reasonable method is not tied to the home market. So it's, it's a reasonable interpretation. So I don't have to go outside the statute and I don't have to accept the SAA's articulation in order to get to the government's position. You do not. We believe the statute is clear and the courts have affirmed that interpretation and have found that any other reasonable method is not tied to the home market. What's your strongest case to support that interpretation? By the way, my clerk has IM'd me, and I don't know if this is true, but he IM'd me that he seems to remember that the SAA was actually approved by an act of Congress, but he's checking now. Is that, I won't, but you're, you don't help. I need the government to tell me that. Because that's different, right? Then it's not just a House report, then it's an act of Congress endorsing the language. So you're not going to get to that site in a minute. This is, it's the CIT court cases, Guam Pong Corp, 163 F sub second, which said because alternative three does not advance a preference for home market data, even though such data might exist, commerce was free to use any other reasonable method to determine plaintiffs constructed value. There's also Thai IE May frozen foods, which is at 477 F sub second, 1332. In that case, the trial court rejected the argument that any other reasonable method under alternative three contains a geographical limitation to the home market. So those are the two cases that support our position that it's only tied, any other reasonable method is not tied to the home market experience. And then as far as the essay, I believe I can get you, I, I would have to double check. I'm not sure. I would have to double check with that. My clerk says it looks like section 101A of the Uruguay round agreement act expressly adopted the SAA. See, that's different for me, right? Something in a house report. That's why I'm talking hierarchy. Something in a house report doesn't necessarily represent the views of both houses of Congress or the president when he passed it, but something that was actually expressly adopted as part of the red, a part of the statute itself was actually agreed to by everyone, including the president who signed it much stronger. So that that's why it meant to me, but don't worry. You don't need to submit it. We're going to figure out the answer to this on our own. This is not that complicated and we can figure this part out. Thank you. Um, let's rebuttal. Thank you. Um, I guess we'll have Mr. Park first. Thank you, Your Honor. I know I have very limited time available, so I'll just, uh, stick to a few key points. I do understand this court's, uh, Your Honor's interpretation and I do accept, uh, the division of the sub paragraph three where, where the, the, uh, home market or foreign country experience is part of the proficat language. I, I do understand, uh, what Your Honor was trying to say. Um, as part of that, uh, issue, what we do want to point out in the remaining time available is that again, there is a requirement for a profit cap as stated in the statutory language and there, uh, commerce reversed course in the final determination where originally as part of its preliminary determination and part of past cases on this very same product, OCTG, it had determined that the same general category of products including line pipe and standard pipe. Um, and therefore it would have had an ability to calculate a profit cap had it kept its same interpretation of the same general category. Indeed, it even instructed the respondents that that was the same general category of merchandise as part of this case. In part, in the final determination reverse course and, uh, and created an imper, impermissibly narrow interpretation where it limited the same general category of merchandise to downhole applications. No one argued for that. It came out in the final determination and that was inconsistent even with commerce's own simultaneous decision in the, in the, uh, the concurrent case of OCTG from Ukraine where commerce actually specifically said that the scope of the case itself is not limited to actual applications, uh, in oil and gas. It can include reject pipe. So in this particular case- Okay, Mr. Park, you're way beyond your time. I was waiting for you to take a breath, but apparently you don't breathe. So, uh, let's hear from Mr. DeFrent. Thank you. Certainly. Thank you, Your Honor, uh, Robert DeFrancesco. Uh, just to quickly go back, um, the cases, uh, Mr. Park was referring to, in those cases, the department did not wholly examine same general category of merchandise. It was something that the department looked at, they applied, but it wasn't examined the way it was examined in this case. There was a voluminous amount of information that was put on the record both by, uh, Maverick and U.S. Steel, uh, and by the respondents that they looked at and considered and addressed this issue of what that same general category of merchandise is. What in the world does that have to do with your appeal? Uh, in our appeal where we're talking about, uh, whether there should or shouldn't be a profit cap and what is in the same general category of merchandise. And in this situation, you don't have the same general category of merchandise sold in Korea. You have a right to rebuttal on your cross appeal. I thought your cross appeal was relevant to whether commerce erred in the first ruling. It is. Is any of what you're saying now relevant to whether commerce erred in the first ruling? Yes, because we believe, again, we had two issues. One was whether they accepted the, uh, should have accepted the financial statement as prejudicial. And two, that there was no obligation to apply a profit cap. I'm sorry. Then please continue. I just wanted to make sure you weren't going outside the scope of what was fair, fairly within your rebuttal. No, no, Your Honor. Please continue. Thanks for explaining. On our second issue, going back to your statutory construction argument, if there are no sales of the same general category of merchandise in Korea, there is no obligation to apply a profit cap. And there are no sales of the same general category of merchandise in Korea because there are no oil wells and there is no oil drilling in Korea. And the, uh, the way the department looked at the same general category was they looked at that is of a quality that could go down hole, which would include the subject merchandise here, the casing and tubing that would go down a hole. But it would also include drill pipe, which is not subject merchandise, which also goes down hole. It would also include stainless steel pipe, which is not subject merchandise, which is also capable of going down hole. And the scope also includes things like limited service pipe, which is not necessarily certified to go down a hole, but can go down a hole, which is the type of pipe, uh, Mr. Park was referring to in the Ukrainian decision. So they limited the same general category of merchandise to something that is broader than the foreign light product, which in this case is casing and tubing. But it also includes things that are capable of going down a hole. And that was how they limited their decision as to what's the same general category. And when you're in a situation where there is no same general category of merchandise, you have no obligation to apply a profit cap. You can't apply a profit cap because you have information of which to construct the profit cap out of. Then there should be no obligation to force commerce to construct a profit cap with no information available to do that. That's all I have, Your Honor, unless you have questions. I thank all counsel. The case is taken under submission.